**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

|  |  |  |
|---|---|---|
| **SOVEREIGN PEAK VENTURES, LLC,** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § § | **JURY TRIAL DEMANDED** |
| **ACER INC. AND ACER AMERICA CORPORATION,** | § § § | **C.A. NO. 6:21-cv-01374** |
| **Defendants.** | § § § | |

## PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Sovereign Peak Ventures, LLC ("SPV") files this Complaint against Defendants Acer Inc. ("AI") and Acer America Corporation ("AAC") (collectively Acer Inc. and Acer America Corporation are referred to as "Defendants," "Acer Group," or "Acer") for infringement of U.S. Patent No. 6,925,097 (the "'097 patent"), U.S. Patent No. 7,685,498 (the "'498 patent"), U.S. Patent No. 8,019,169 (the "'169 patent"), U.S. Patent No. 8,737,476 (the "'476 patent"), U.S. Patent No. 8,971,401 (the "'401 patent"), U.S. Patent No. 9,042,457 (the "'457 patent"), U.S. Patent No. 9,414,059 (the "'059 patent"), and U.S. Patent No. 9,667,972 (the "'972 patent") (collectively, the "Asserted Patents").

## THE PARTIES

1.      Sovereign Peak Ventures, LLC is a Texas limited liability company, with a principal place of business in Allen, TX.

2.      On information and belief, Acer Inc. is a corporation organized and existing under the laws of Taiwan with a principal place of business at 8F., No.88, Sec. 1, Xintai 5th Rd., Xizhi Dist., New Taipei City 221, Taiwan. Acer Inc. owns 100% of the shares of Boardwalk Capital

1

Holdings limited. Boardwalk Capital Holdings limited owns 100% of the shares of Acer American Holdings Corporation. Acer American Holdings Corporation owns 100% of the shares of Gateway, Inc. Gateway, Inc. holds more than 10% of the shares of Acer America Corporation. Acer Inc. holds at least a 10% interest in and, on information and belief, a controlling interest in Acer America Corporation.

3.      On information and belief, Acer America Corporation is a corporation organized and existing under the laws of California. Acer America Corporation maintains a place of business in this District, including at 1394 Eberhardt Rd, Temple, Texas 76504.

4.      On information and belief, each Defendant, individually and with Acer Group, is engaged in making, using, selling, offering for sale, and/or importing, and/or induces its subsidiaries, affiliates, retail partners, and customers in the making, using, selling, offering for sale, and/or importing throughout the United States, including within this District, products, such as computers, accused of infringement. Acer America Corporation operates in agency as part of the Acer Group. Acer America Corporation in agency with the Acer Group provides a distribution channel of infringing products within this District and the U.S. nationally. Further, Acer America Corporation regularly imports and inserts into the stream of commerce computers, such that infringing computers will be offered for sale and sold in this District and throughout the United States.

5.      On information and belief, Defendants are an interrelated group of companies which collectively comprise one of the largest electronics manufacturers in the United States.

6.      On information and belief, Defendants, individually, together, and/or in concert, participate in the design, development, manufacture, sale for importation into the United States, offers for sale for importation into the United States, importation into the United States, sale within

the United States after importation, and offers for sale within the United States after importation, of computers that infringe the Asserted Patents.

7.     The Asserted Patents were invented by employees of Panasonic Corporation ("Panasonic"). Founded in 1918, Panasonic has been at the forefront of the electronics industry for over a century. Panasonic made numerous innovations in the home appliance, battery, mobile phone, and television industries. Indeed, Panasonic's invention of the "Paper Battery" in 1979 is widely credited as enabling the compact electronics of today. In 1991, Panasonic released the Mova P, the smallest and lightest mobile phone on the market, which revolutionized the industry by showing the demand for a compact, lightweight device. Panasonic also produced the first wide-format plasma display and developed the first digital television for the U.S. market. Panasonic's history of innovation is also borne out by its intellectual property. Indeed, a search of the USPTO database where the patent assignee is "Panasonic" yields over 27,000 matches.

8.     Prior to the filing of the Complaint, SPV attempted to engage Acer and/or its agents in good faith licensing discussions related to the Asserted Patents, including by conducting technical and licensing discussions with employees from Acer's in-house legal department responsible for patent matters on April 20 and June 9, 2021. Acer's past and continuing sales of its devices i) willfully infringe the Asserted Patents and ii) impermissibly take the significant benefits of SPV's patented technologies without fair compensation to SPV.

9.     On information and belief, Defendants operate in agency with each other as a group. *See, e.g.*, https://www.acer-group.com/ag/en/TW/content/home ("Acer is one of the world's top ICT companies with a presence in more than 160 countries."). Acer induces its subsidiaries, affiliates, retail partners, and customers in the making, using, selling, offering for sale, and/or importing throughout the United States, including within this District, products, such as computers

and projectors, accused of infringement. Defendants provide a distribution channel of infringing products within this District and the U.S. nationally. Defendants, between and amongst themselves, purposefully direct the Accused Products into established distribution channels within this District and the U.S. nationally.

10.     On information and belief, Defendants maintain a corporate presence in the United States via at least its, U.S.-based sales subsidiaries including, Acer America Corporation. Acer America Corporation provides sales and distribution support in North America as part of the Acer Group and for related entities. Acer America Corporation is an agent of Acer Inc. At the direction and control of the Acer Group, U.S.-based sales subsidiaries including, Acer America Corporation imports infringing products, such as computers and projectors, into the United States and this District.

11.     On information and belief, Acer and its U.S.-based sales subsidiaries (which act as part of a global network of overseas sales and manufacturing subsidiaries on behalf of Acer) have operated as agents of one another and vicariously as parts of the same business group to work in concert together and enter into agreements that are nearer than arm's length. For example, Acer Inc., alone and via at least the activities of its U.S.-based sales subsidiaries (e.g., Acer America Corporation), conducts business in the United States, including importing, distributing, and selling computers and projectors that incorporate devices, systems, and processes that infringe the Asserted Patents in Texas and this judicial district. *See Trois v. Apple Tree Auction Center, Inc.*, 882 F.3d 485, 490 (5th Cir. 2018) ("A defendant may be subject to personal jurisdiction because of the activities of its agent within the forum state…."); *see also Cephalon, Inc. v. Watson Pharmaceuticals, Inc.*, 629 F. Supp. 2d 338, 348 (D. Del. 2009) ("The agency theory may be applied not only to parents and subsidiaries, but also to companies that are 'two arms of the same

business group,' operate in concert with each other, and enter into agreements with each other that are nearer than arm's length.").

12.     Through offers to sell, sales, imports, distributions, and other related agreements to transfer ownership of Defendants' electronics, such as computers and projectors, with distributors and customers operating in and maintaining a significant business presence in the U.S. and/or its U.S. subsidiaries, Acer America Corporation, Defendants do business in the U.S., the state of Texas, and in this District.

**JURISDICTION AND VENUE**

13.     This action arises under the patent laws of the United States, namely 35 U.S.C. §§ 271, 281, and 284-285, among others.

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c) and 1400(b). Acer Inc. is a foreign entity and may be sued in any judicial district under 28 U.S.C. § 1391(c)(3). Acer America Corporation has committed acts of infringement in this District and has regular and established places of business in this District, including at least 1394 Eberhardt Rd, Temple, Texas 76504.

16.     This Court has general and specific personal jurisdiction over Defendants pursuant to due process and/or the Texas Long Arm Statute because, *inter alia*, (i) Defendants have done and continue to do business in Texas and (ii) Defendants have, directly and through intermediaries, committed and continue to commit acts of patent infringement in the State of Texas, including making, using, offering to sell, and/or selling accused products in Texas, and/or importing accused products into Texas, including by Internet sales and sales via retail and wholesale stores, inducing

others to commit acts of patent infringement in Texas, and/or committing a least a portion of any other infringements alleged herein. Defendants have placed, and are continuing to place, infringing products into the stream of commerce, via an established distribution channel, with the knowledge and/or understanding that such products are sold in Texas, including in this District. Defendants have derived substantial revenues from its infringing acts occurring within Texas and within this District. Defendants have substantial business in this State and judicial district, including: (A) at least part of its infringing activities alleged herein; and (B) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from infringing goods offered for sale, sold, and imported, and services provided to Texas residents vicariously through and/or in concert with its alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, and/or consumers.

17. This Court has personal jurisdiction over Defendants, directly or through intermediaries, distributors, importers, customers, subsidiaries, and/or consumers including its U.S.-based sales subsidiaries, e.g., Acer America Corporation. Through direction and control of such subsidiaries, Defendants have committed acts of direct and/or indirect patent infringement within Texas, and elsewhere within the United States, giving rise to this action and/or has established minimum contacts with Texas such that personal jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. Acer America Corporation is controlled by Acer Inc. The primary business of Acer America Corporation is the marketing and sale of electronic products in the United States. Acer Inc. has a controlling ownership interest in Acer America Corporation and maintains more than half of the voting rights for such subsidiaries as its basis for control. Upon information and belief, Acer Inc. compensates Acer America

Corporation for its sales support services in the United States. As such, Acer Inc. has a direct financial interest in its U.S.-based subsidiaries, and vice versa.

18.     Personal jurisdiction is proper because Defendants have committed acts of infringement in this District. This Court has personal jurisdiction over Defendants because, *inter alia*, this action arises from activities Defendants purposefully directed towards the State of Texas and this District.

19.     Exercising personal jurisdiction over Defendants in this District would not be unreasonable given Defendants' contacts in this District, the interest in this District of resolving disputes related to products sold herein, and the harm that would occur to SPV.

20.     In addition, Defendants have knowingly induced and continue to knowingly induce infringement within this District by advertising, marketing, offering for sale and/or selling devices pre-loaded with infringing functionality within this District, to consumers, customers, manufacturers, distributors, resellers, partners, and/or end users, and providing instructions, user manuals, advertising, and/or marketing materials which facilitate, direct or encourage the use of infringing functionality with knowledge thereof.

21.     Personal jurisdiction also exists specifically over each of the Defendants because each, directly or through affiliates, subsidiaries, agents, or intermediaries, transacts business in this State or purposefully directed at this State (including, without limitation, retail stores including Best Buy and Walmart) by making, importing, offering to sell, selling, and/or having sold infringing products within this State and District or purposefully directed at this State or District.

22.     Personal jurisdiction also exists specifically over each of the Defendants because Defendants have overlapping executives, interlocking corporate structures, and close relationships as manufacturer, importer, and distributor of the products accused of infringement.

23.     To the extent any foreign Defendant is not subject to jurisdiction in any state's court of general jurisdiction, exercising jurisdiction over such Defendant in this State and this District would be consistent with due process and this State's long-arm statute and under national contacts in light of facts alleged in this Complaint.

24.     In addition, each of the Defendants, directly or through affiliates, subsidiaries, agents, or intermediaries, places infringing products into the stream of commerce knowing they will be sold and used in Texas, and economically benefits from the retail sale of infringing products in this State. For example, Defendants' products have been sold and are available for sale in this District at Best Buy and Walmart retail stores, and are also available for sale and offered for sale in this District through online retailers such as Best Buy, Walmart, and Amazon. Acer also advertises its infringing products and provides customer support of its infringing products to consumers in Texas and this District through its agent's websites. *See, e.g.*, https://store.acer.com/en-us/laptops; https://www.acer.com/ac/en/US/content/support.

25.     With respect to the Asserted Patents, the Accused Products are devices that support H.265/HEVC video, including, but not limited to projectors and computers (e.g., 24" Acer Chromebase 24I2 Touch, 27" Aspire C 27 All-in-One Desktop, Acer, Acer Chromebook 311, Acer Chromebook 311 & Wireless Mouse, Acer Chromebook 314, Acer Chromebook 314 & Wireless Mouse, Acer Chromebook 315 Touch, Acer Chromebook 512, Acer Chromebook Spin 13, Acer Chromebook Spin 713, Acer Chromebox, Acer ENDURO N3, Acer ENDURO N3 Rugged Laptop, Acer ENDURO N7, Acer ENDURO T1 Tablet, Acer ENDURO Urban N3, Acer ENDURO Urban N3, Aspire 1, Aspire 1 Laptop, Aspire 3, Aspire 3 Laptop, Aspire 5, Aspire 5 Laptop, Aspire 7 Laptop, Aspire C24, Aspire C24 All-in-One Desktop, Aspire C27, Aspire TC, Aspire TC Desktop, Aspire XC, Aspire XC Desktop, Chromebook Spin 713, Chromebase,

Chromebook 311, Chromebook 312, Chromebook 313, Chromebook 314, Chromebook 315, Chromebook 317, Chromebook 318, Chromebook 512, Chromebook 712, Chromebook 715, Chromebook Enterprise 715, Chromebook Spin 511, Chromebook Spin 512,Chromebook Spin 514, Chromebook Spin 716, Chromebox CXI3, Chromebox CXi4, Chromebox Enterprise, ConceptD 3 Ezel, Enduro Urban N3, Nitro 5, Nitro 5 Gaming Laptop, Nitro 50, Predator Helios 300, Predator Helios 300 Gaming Laptop, Predator Helios 500, Predator Helios 700, Predator Helios 700 Gaming Laptop, Predator Orion 3000, Predator Orion 5000, Predator Orion 9000, Predator Triton 300, Predator Triton 300 SE, Predator Triton 300 SE Gaming Laptop, Predator Triton 500, Predator Triton 500 Gaming Laptop, Predator Triton 500 SE, Predator Triton 700, Predator Triton 900, Spin 1, Spin 1 Laptop, Spin 3, Spin 3 Laptop, Spin 5, Spin 5 Laptop, Spin 511, Spin 512, Swift 1, Swift 3, Swift 3 Laptop, Swift 3X Laptop, Swift 5, Swift 5 Laptop, Swift X laptop, TravelMate B3, TravelMate P2, TravelMate P4, TravelMate P6, TravelMate P6 Laptop, Veriton, Veriton X, Veriton X Desktop), as well as, their components, and processes related to the same.

26. On information and belief, Acer controls or otherwise directs and authorizes all activities of its U.S.-based sales subsidiaries. Such directed and authorized activities include, the U.S. Subsidiaries' using, offering for sale, selling, and/or importing the Accused Products, their components, and/or products containing the same that incorporate the fundamental technologies covered by the Asserted Patents. The Defendants' U.S.-based sales subsidiaries are authorized to import, distribute, sell, or offer for sale the Accused Products on behalf of Defendants. For example, Acer researches, designs, develops, and manufactures computers and then directs its U.S.-based sales subsidiaries to import, distribute, offer for sale, and sell the Accused Products in the United States. *See, e.g., United States v. Hui Hsiung*, 778 F.3d 738, 743 (9th Cir. 2015) (finding

that the sale of infringing products to third parties rather than for direct import into the U.S. did not "place [defendants'] conduct beyond the reach of United States law [or] escape culpability under the rubric of extraterritoriality"). Furthermore, Defendants' U.S.-based sales subsidiaries also administer, on behalf of Defendants, requests for service under and any disputes arising from Defendants' limited warranty of the Accused Products sold in the U.S., including in Texas and this judicial district. *See, e.g.*, https://static.acer.com/up/Resource/Acer/Docs/US/Standard%20Warranty/PanAm-20150126/20150129/Acer_CONS_WTY_DOC_1_YR_MICI_US_CA_MX_LA_46_AD148_00 8_090514.pdf. Thus, Defendants' U.S.-based sales subsidiaries conduct infringing activities on behalf of Defendants.

27. On information and belief, Defendants' U.S.-based sales subsidiaries corporate presence in the United States gives Acer substantially the business advantages that it would have enjoyed if it conducted its business through its own offices or paid agents in the state. Defendants' U.S.-based sales subsidiaries are authorized to import, distribute, sell, and offer for sale Defendants' products, including computers incorporating infringing devices and processes, on behalf of Defendants. For example, Defendants' U.S.-based sales subsidiaries operate within Defendants' global network of sales subsidiaries in North and South America, Europe, Asia, Australia, and the Middle East. In the U.S., including within the Western District of Texas, Defendants' projectors and computers, which comprise infringing devices and processes, are imported, distributed, offered for sale, and sold.

28. Via Defendants' alter egos, agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers maintaining a business presence, operating in, and/or residing in the U.S., Defendants' products, including products and processes accused of infringing the

Asserted Patents, are or have been widely distributed and sold in retail stores, both brick and mortar and online, in Texas including within this judicial district. *See Litecubes, LLC v. Northern Light Products, Inc.*, 523 F.3d 1353, 1369-70 (Fed. Cir. 2008) ("[T]he sale [for purposes of § 271] occurred at the location of the buyer."); *see also Semcon IP Inc. v. Kyocera Corp.*, No. 2:18-cv-00197-JRG, 2019 WL 1979930, at *3 (E.D. Tex. May 3, 2019) (denying accused infringer's motion to dismiss because plaintiff sufficiently plead that purchases of infringing products outside of the United States for importation into and sales to end users in the U.S. may constitute an offer to sell under § 271(a)). For example, Defendants' computers are sold to end users by the U.S.-based subsidiaries, distributors, and customers online and at retail stores located throughout the Western District of Texas.

29. On information and belief, Acer has placed and continues to place infringing products and/or products that practice infringing processes into the stream of commerce via established distribution channels comprising at least subsidiaries and distributors, such as Acer America Corporation, and customers such as Walmart, Best Buy, and Amazon, with the knowledge and/or intent that those products are and/or will be imported, used, offered for sale, sold, and continue to be sold in the United States and Texas, including in this judicial district. As a result, Acer has, vicariously through and/or in concert with its alter egos, agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers, placed the Accused Products into the stream of commerce via established distribution channels with the knowledge and/or intent that those products were sold and continue to be sold in the United States and Texas, including in this judicial district.

30. In the alternative, the Court has personal jurisdiction over Defendants under Federal Rule of Civil Procedure 4(k)(2), because the claims for patent infringement in this action arise

under federal law, Defendants are not subject to the jurisdiction of the courts of general jurisdiction of any state, and exercising jurisdiction over Defendants is consistent with the U.S. Constitution.

31.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because, among other things, Defendants are not residents in the United States, and thus may be sued in any judicial district, including this one, pursuant to 28 U.S.C. § 1391(c)(3). *See In re HTC Corp.*, 889 F.3d 1349, 1357 (Fed. Cir. 2018) ("The Court's recent decision in *TC Heartland* does not alter" the alien-venue rule.).

## COUNT I
### (INFRINGEMENT OF U.S. PATENT NO. 6,925,097)

32.     Plaintiff incorporates paragraphs 1 through 31 herein by reference.

33.     SPV is the assignee of the '097 patent, entitled "Decoder, decoding method, multiplexer, and multiplexing method," with ownership of all substantial rights in the '097 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

34.     The '097 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '097 patent issued from U.S. Patent Application No. 09/820,311.

35.     Acer has and continues to directly and/or indirectly infringe (by inducing infringement) one or more claims of the '097 patent in this judicial district and elsewhere in Texas and the United States.

36.     On information and belief, Acer designs, develops, manufactures, assembles and markets computers, projectors, and other devices configured to decode H.265/HEVC video. The Accused Products include a processor that supports H.265/HEVC video decoding. For example, the     Swift     X     laptop     an     Intel     H35     series     processor.     *See*

https://www.acer.com/ac/en/US/content/series/swiftxintel (last visited November 23, 2021) (stating "Engineered for creation and play, the Swift X houses the latest 11th Gen Intel® Core™ H35 series processors."). As an eleventh-generation processor, the H35 series processor in the Swift X laptop includes supports H.265/HEVC video decoding. *See* https://www.intel.com/content/www/us/en/developer/articles/technical/encode-and-decode-capabilities-for-7th-generation-intel-core-processors-and-newer.html (last visited November 23, 2021).

37.     Acer directly infringes the '097 patent via 35 U.S.C. § 271(a) by making, offering for sale, selling, and/or importing those Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '097 patent to, for example, its alter egos, agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers. Furthermore, on information and belief, Acer sells and makes the Accused Products outside of the United States, delivers those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby directly infringing the '097 patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, Acer directly infringes the '097 patent through its direct involvement in the activities of its subsidiaries, including Acer America Corporation, including by selling and offering for sale the Accused Products directly to such subsidiaries and importing the Accused Products into the United States for such subsidiaries. Such subsidiaries conduct activities that constitute direct infringement of the '097 patent under 35 U.S.C. § 271(a) by making, offering for sale, selling, and/or importing those

Accused Products. For example, and on information and belief, Acer offers for sale, sells, and imports the Accused Products within the U.S. to, for example, its distributors, customers, subsidiaries, importers, and/or consumers. Further, Acer is vicariously liable for this infringing conduct of its U.S.-based sales subsidiaries, e.g., Acer America Corporation, (under both the alter ego and agency theories) because, as an example and on information and belief, Acer and Acer America Corporation are essentially the same company, and Acer has the right and ability to control its subsidiaries infringing acts and receives a direct financial benefit from the infringement of its U.S.-based sales subsidiaries.

38. For example, Acer infringes claim 4 of the '097 patent via the Accused Products. The Accused Products perform the "decoding method for carrying out a decoding process for a multiplexed stream which is obtained by multiplexing plural streams in parallel for each of the streams included in the multiplexed stream" of claim 4. For example, the Accused Products implement a decoding method to carry out a H.265/HEVC decoding process using multi-level slice fragmentation feature. The decoding process decodes input image bitstream(s) including picture frames, each individually a multiplexed stream that is obtained by encoding multiple smaller units (plural streams) that comprise the entire bitstream including its picture frames.

39. The Accused Products perform "separating the multiplexed stream into plural streams." For example, the HEVC decoding process involves dividing an encoded input bitstream including individual picture frames, each of which is a multiplexed stream, into multiple slices ("plural streams").

40. The Accused Products perform "selecting one of the plural separated streams such that a target of a decoding process is converted from one stream to another stream." For example, the HEVC decoding process involves decoding each of the slices in an input picture frame one by

one until all slice segments in a slice are decoded, ensuring that the entire slice is decoded before moving to the following slice:



In the example above, one of the plural separated streams, slice 1, is selected to be decoded first, followed by slice 2 in the decoding process, thereby switching the decoding order from slice 1 to slice 2 ("such that a target of a decoding process converted from one stream to another stream").

41.    The Accused Products perform "decoding one of the plural separated streams output by the stream selection process." For example, the selection process from the above example selects slice 1 which is then decoded. The entire slice (all slice segments) is decoded in the decoding process.

42.    The Accused Products perform "wherein said selecting comprises detecting a stream switchable position in a stream being subjected to said decoding, at which position said decoding can be interrupted, and performing said selecting such that said decoding for the stream which is being processed is interrupted at the stream switchable position." For example, HEVC decoding process detects the end of the last slice segment in a slice, which is a stream switchable position where the decoding can be interrupted. After the decoding is interrupted, decoding for the following slice (slice 2 in the example above) begins.

43.     The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

44.     At a minimum, Acer has known of the '097 patent at least as early as the filing date of the Complaint. In addition, Acer has known about the '097 patent at least as early as April 20, 2021, when it met with SPV to discuss the patents-in-suit. Further, Acer has known about the '097 patent since at least February 4, 2021, when Acer acknowledged access to a data room providing notice of its infringement. Moreover, Acer has been on notice of the '097 patent as a result of previous lawsuits filed by the Plaintiff against competitors of Acer and other relevant market participants, such as TCL and Hisense.

45.     Prior to the filing of the Complaint, Acer knew or should have known of the '097 patent, and knew or should have known that they infringed the '097 patent's claims. Indeed, at a minimum, they exercised willful blindness to the existence of the '097 patent and took deliberately wrongful steps to ignore their infringement of the '097 patent.

46.     On information and belief, since at least the above-mentioned date when Acer was on notice of its infringement, Acer has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the Accused Products that include or are made using all of the limitations of one or more claims of the '097 patent to directly infringe one or more claims of the '097 patent by using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned date, Acer does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '097 patent. Acer intends to cause, and have taken affirmative steps to induce infringement by distributors, importers, customers, subsidiaries, and/or consumers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products,

creating and/or maintaining established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, testing and certifying features related to H.265 decoding in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. As noted above, this includes, but is not limited to, the collective willful blindness of the Acer Group, including their singular and collective refusal to investigate whether the Accused Products infringe the '097 patent.

47.     On information and belief, despite having knowledge of the '097 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '097 patent, Acer has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Acer's infringing activities relative to the '097 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

48.     SPV has been damaged as a result of Acer's infringing conduct described in this Count. Acer is, thus, liable to SPV in an amount that adequately compensates SPV for Acer's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284

## COUNT II
(INFRINGEMENT OF U.S. PATENT NO. 7,685,498)

49.     Plaintiff incorporates paragraphs 1 through 48 herein by reference.

50.    SPV is the assignee of the '498 patent, entitled "Digital broadcasting system and digital broadcast transmission and reception method," with ownership of all substantial rights in the '498 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

51.    The '498 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '498 patent issued from U.S. Patent Application No. 10/586,438.

52.    Acer has and continues to directly and/or indirectly infringe (by inducing infringement) one or more claims of the '498 patent in this judicial district and elsewhere in Texas and the United States.

53.    On information and belief, Acer designs, develops, manufactures, assembles and markets computers, projectors, and other devices configured to decode H.265/HEVC video. The Accused Products include a processor that supports H.265/HEVC video decoding. For example, the Swift X laptop an Intel H35 series processor. See https://www.acer.com/ac/en/US/content/series/swiftxintel (last visited November 23, 2021) (stating "Engineered for creation and play, the Swift X houses the latest 11th Gen Intel® Core™ H35 series processors."). As an eleventh-generation processor, the H35 series processor in the Swift X laptop includes supports H.265/HEVC video decoding. See https://www.intel.com/content/www/us/en/developer/articles/technical/encode-and-decode-capabilities-for-7th-generation-intel-core-processors-and-newer.html (last visited November 23, 2021).

54.    Acer directly infringes the '498 patent via 35 U.S.C. § 271(a) by making, offering for sale, selling, and/or importing those Accused Products, their components and processes, and/or

products containing the same that incorporate the fundamental technologies covered by the '498 patent to, for example, its alter egos, agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers. Furthermore, on information and belief, Acer sells and makes the Accused Products outside of the United States, delivers those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby directly infringing the '498 patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, Acer directly infringes the '498 patent through its direct involvement in the activities of its subsidiaries, including Acer America Corporation, including by selling and offering for sale the Accused Products directly to such subsidiaries and importing the Accused Products into the United States for such subsidiaries. Such subsidiaries conduct activities that constitute direct infringement of the '498 patent under 35 U.S.C. § 271(a) by making, offering for sale, selling, and/or importing those Accused Products. For example, and on information and belief, Acer offers for sale, sells, and imports the Accused Products within the U.S. to, for example, its distributors, customers, subsidiaries, importers, and/or consumers. Further, Acer is vicariously liable for this infringing conduct of its U.S.-based sales subsidiaries, e.g., Acer America Corporation, (under both the alter ego and agency theories) because, as an example and on information and belief, Acer and Acer America Corporation are essentially the same company, and Acer has the right and ability to control its subsidiaries infringing acts and receives a direct financial benefit from the infringement of its U.S.-based sales subsidiaries.

55.     For example, Acer infringes claim 10 of the '498 patent via the Accused Products. The Accused Products comprise the "reception apparatus for use in a digital broadcasting system for transmitting and receiving, via a network, a broadcast stream created from a broadcast source, the broadcast source including image and audio data and being used for broadcasting" of claim 10. For example, the Accused Products are each a reception apparatus that receives digital HEVC-encoded content streams of video and audio, such as HEVC encoded live broadcast content. *See, e.g.,* https://www.acer.com/ac/en/US/content/series/nitro50 (last visited on November 23, 2021) (stating "Game, stream, and design like a pro with an 12th Gen Intel® Core™ i7 Processor"); https://www.intel.com/content/www/us/en/developer/articles/technical/encode-and-decode-capabilities-for-7th-generation-intel-core-processors-and-newer.html (last visited November 23, 2021) (stating that 12th generation processors support H.265/HEVC video decoding).

56.     The Accused Products each comprise "a receiving unit operable to receive the broadcast stream via the network." For example, the Accused Products are configured to receive the H.265/HEVC encoded broadcast stream via the internet. *See, e.g.,* https://www.acer.com/ac/en/US/content/series/nitro50 (last visited on November 23, 2021) (stating "Game, stream, and design like a pro with an 12th Gen Intel® Core™ i7 Processor"); https://www.intel.com/content/www/us/en/developer/articles/technical/encode-and-decode-capabilities-for-7th-generation-intel-core-processors-and-newer.html (last visited November 23, 2021) (stating that 12th generation processors support H.265/HEVC video decoding).

57.     The Accused Products each comprise "a decoding unit operable to extract, from the received broadcast stream, at least one of a first layer code and a second layer code, the first layer code and the second layer code (i) being generated from the broadcast source coded based on a characteristic of the broadcast source, and (ii) respectively being for reproduction of the broadcast

source." For example, the Accused Products have H.265 decoding units that are configured to extract coded NAL Unit Types (nal_unit_type) from the received stream. The NAL Unit Types correspond to the first layer code and second layer code. The NAL Unit Type is generated during the coding process at the broadcast source and coded based on the broadcast source (i.e., VCL NAL Units contain picture data and non-VCL NAL Units contain supplemental decoding information). The NAL Unit Type identifies whether a NAL Unit is a Video Coding Layer NAL Unit or a non-VCL NAL Unit. The codes are used for the decoding process.

58.     The Accused Products each comprise "a reproducing unit operable to reproduce the broadcast source using the at least one of the first layer code and the second layer code extracted by said decoding unit." For example, the Accused Products have a unit that outputs a signal that is a reproduction of the source media. The devices use the NAL Unit Types to reconstruct the media. For example the NAL Unit Types govern the picture output order. The Accused Products are configured to display the reproduced broadcast source.

59.     The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

60.     At a minimum, Acer has known of the '498 patent at least as early as the filing date of the Complaint. In addition, Acer has known about the '498 patent at least as early as April 20, 2021, when it met with SPV to discuss the patents-in-suit. Further, Acer has known about the '498 patent since at least February 4, 2021, when Acer acknowledged access to a data room providing notice of its infringement. Moreover, Acer has been on notice of the '498 patent as a result of previous lawsuits filed by the Plaintiff against competitors of Acer and other relevant market participants, such as TCL and Hisense.

61.     Prior to the filing of the Complaint, Acer knew or should have known of the '498 patent, and knew or should have known that they infringed the '498 patent's claims. Indeed, at a minimum, they exercised willful blindness to the existence of the '498 patent and took deliberately wrongful steps to ignore their infringement of the '498 patent.

62.     On information and belief, since at least the above-mentioned date when Acer was on notice of its infringement, Acer has actively induced, under U.S.C. § 271(b), distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the Accused Products that include or are made using all of the limitations of one or more claims of the '498 patent to directly infringe one or more claims of the '498 patent by using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned date, Acer does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '498 patent. Acer intends to cause, and have taken affirmative steps to induce infringement by distributors, importers, customers, subsidiaries, and/or consumers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, testing and certifying features related to H.265 decoding in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. As noted above, this includes, but is not limited to, the collective willful blindness of the Acer Group, including their singular and collective refusal to investigate whether the Accused Products infringe the '498 patent.

63. On information and belief, despite having knowledge of the '498 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '498 patent, Acer has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Acer's infringing activities relative to the '498 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

64. SPV has been damaged as a result of Acer's infringing conduct described in this Count. Acer is, thus, liable to SPV in an amount that adequately compensates SPV for Acer's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT III
### (INFRINGEMENT OF U.S. PATENT NO. 8,019,169)

65. Plaintiff incorporates paragraphs 1 through 64 herein by reference.

66. SPV is the assignee of the '169 patent, entitled "Image coding apparatus, image decoding apparatus, image processing apparatus and methods thereof," with ownership of all substantial rights in the '169 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

67. The '169 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '169 patent issued from U.S. Patent Application No. 12/014,895.

68.     Acer has and continues to directly and/or indirectly infringe (by inducing infringement) one or more claims of the '169 patent in this judicial district and elsewhere in Texas and the United States.

69.     On information and belief, Acer designs, develops, manufactures, assembles and markets computers, projectors, and other devices configured to decode H.265/HEVC video. The Accused Products include a processor that supports H.265/HEVC video decoding. For example, the Swift X laptop an Intel H35 series processor. See https://www.acer.com/ac/en/US/content/series/swiftxintel (last visited November 23, 2021) (stating "Engineered for creation and play, the Swift X houses the latest 11th Gen Intel® Core™ H35 series processors."). As an eleventh-generation processor, the H35 series processor in the Swift X laptop includes supports H.265/HEVC video decoding. See https://www.intel.com/content/www/us/en/developer/articles/technical/encode-and-decode-capabilities-for-7th-generation-intel-core-processors-and-newer.html (last visited November 23, 2021).

70.     Acer directly infringes the '169 patent via 35 U.S.C. § 271(a) by making, offering for sale, selling, and/or importing those Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '169 patent to, for example, its alter egos, agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers. Furthermore, on information and belief, Acer sells and makes the Accused Products outside of the United States, delivers those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby

directly infringing the '169 patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, Acer directly infringes the '169 patent through its direct involvement in the activities of its subsidiaries, including Acer America Corporation, including by selling and offering for sale the Accused Products directly to such subsidiaries and importing the Accused Products into the United States for such subsidiaries. Such subsidiaries conduct activities that constitute direct infringement of the '169 patent under 35 U.S.C. § 271(a) by making, offering for sale, selling, and/or importing those Accused Products. For example, and on information and belief, Acer offers for sale, sells, and imports the Accused Products within the U.S. to, for example, its distributors, customers, subsidiaries, importers, and/or consumers. Further, Acer is vicariously liable for this infringing conduct of its U.S.-based sales subsidiaries, e.g., Acer America Corporation, (under both the alter ego and agency theories) because, as an example and on information and belief, Acer and Acer America Corporation are essentially the same company, and Acer has the right and ability to control its subsidiaries infringing acts and receives a direct financial benefit from the infringement of its U.S.-based sales subsidiaries.

71.     For example, Acer infringes claim 21 of the '169 patent via the Accused Products. The Accused Products perform the "image decoding method" of claim 21. For example, the Accused Products implement a decoding method to carry out a H.265/HEVC decoding process.

72.     The Accused Products perform "acquiring a bit stream and additional information which indicates a first still image." For example, in the HEVC decoding process a decoder acquires a bit stream and additional information by receiving an input bitstream and extracting a sub-bitstream (additional information) identified as BitstreamToDecode that indicates a current picture (first still image) via the variable CurrPic. The ITU-T H.265 Standard provides support for this:

> **8 Decoding process**
>
> **8.1 General decoding process**
>
> **8.1.1 General**
>
> Input to this process is a bitstream. Output of this process is a list of decoded pictures.

> **sub-bitstream extraction process**: A specified process by which *NAL units* in a *bitstream* that do not belong to a target set, determined by a target highest TemporalId and a target *layer identifier list*, are removed from the *bitstream*, with the output sub-bitstream consisting of the NAL units in the *bitstream* that belong to the target set.

> **F.8.1.3 Common decoding process for a coded picture**
>
> The decoding processes specified in the remainder of this clause apply to each coded picture, referred to as the current picture and denoted by the variable CurrPic, in BitstreamToDecode.

73.     The Accused Products perform "acquiring a second still image indicated in the additional information." For example, in the HEVC decoding process, the decoder acquires a reference picture (second still image) by selecting a reference picture from a reference picture list, which is included in the sub-bitstream (additional information). The ITU-T H.265 Standard provides support for this:

**8.3.2    Decoding process for reference picture set**

This process is invoked once per picture, after decoding of a slice header but prior to the decoding of any coding unit and prior to the decoding process for reference picture list construction for the slice as specified in clause 8.3.4. This process may result in one or more reference pictures in the DPB being marked as "unused for reference" or "used for long-term reference".

> NOTE 1 – The RPS is an absolute description of the reference pictures used in the decoding process of the current and future coded pictures. The RPS signalling is explicit in the sense that all reference pictures included in the RPS are listed explicitly.

**8.3.4    Decoding process for reference picture lists construction**

This process is invoked at the beginning of the decoding process for each P and B slice.

Reference pictures are addressed through reference indices as specified in clause 8.5.3.3.2. A reference index is an index into a reference picture list. When decoding a P slice, there is a single reference picture list RefPicList0. When decoding a B slice, there is a second independent reference picture list RefPicList1 in addition to RefPicList0.

At the beginning of the decoding process for each slice, the reference picture lists RefPicList0 and, for B slices, RefPicList1 are derived.

**8.5.3.3.2   Reference picture selection process**

Input to this process is a reference index refIdxLX.

Output of this process is a reference picture consisting of a two-dimensional array of luma samples refPicLX$_L$ and, when ChromaArrayType is not equal to 0, two two-dimensional arrays of chroma samples refPicLX$_{Cb}$ and refPicLX$_{Cr}$.

The output reference picture RefPicListX[ refIdxLX ] consists of a pic_width_in_luma_samples by pic_height_in_luma_samples array of luma samples refPicLX$_L$ and, when ChromaArrayType is not equal to 0, two PicWidthInSamplesC by PicHeightInSamplesC arrays of chroma samples refPicLX$_{Cb}$ and refPicLX$_{Cr}$.

The reference picture sample arrays refPicLX$_L$, refPicLX$_{Cb}$ and refPicLX$_{Cr}$ correspond to decoded sample arrays S$_L$, S$_{Cb}$ and S$_{Cr}$ derived in clause 8.7 for a previously-decoded picture.

74.    The Accused Products perform "generating a predictive image for the first image using the second still image as a reference image." For example, in the inter prediction processes included in the H.265 decoding process, the predictive picture is created from the reference picture. The output of the inter prediction decoding is a modified reconstructed picture before deblocking filtering, which is a predictive image. The ITU-T H.265 Standard provides support for this:

**3.69** **inter prediction**: A *prediction* derived in a manner that is dependent on data elements (e.g., sample values or motion vectors) of one or more *reference pictures*.

> NOTE – A prediction from a reference picture that is the current picture itself is also inter prediction.

**8.5** **Decoding process for coding units coded in inter prediction mode**

**8.5.1** **General decoding process for coding units coded in inter prediction mode**

Inputs to this process are:

– a luma location ( xCb, yCb ) specifying the top-left sample of the current luma coding block relative to the top-left luma sample of the current picture,

– a variable log2CbSize specifying the size of the current coding block.

Output of this process is a modified reconstructed picture before deblocking filtering.

**8.5.2** **Inter prediction process**

This process is invoked when decoding coding unit whose CuPredMode[ xCb ][ yCb ] is not equal to MODE_INTRA.

Inputs to this process are:

– a luma location ( xCb, yCb ) specifying the top-left sample of the current luma coding block relative to the top-left luma sample of the current picture,

– a variable log2CbSize specifying the size of the current luma coding block.

Outputs of this process are:

– an (nCbS$_L$)x(nCbS$_L$) array predSamples$_L$ of luma prediction samples, where nCbS$_L$ is derived as specified below,

– when ChromaArrayType is not equal to 0, an (nCbSw$_C$)x(nCbS$_C$) array predSamples$_{Cb}$ of chroma prediction samples for the component Cb, where nCbSw$_C$ and nCbSh$_C$ are derived as specified below,

– when ChromaArrayType is not equal to 0, an (nCbSw$_C$)x(nCbS$_C$) array predSamples$_{Cr}$ of chroma prediction samples for the component Cr, where nCbSw$_C$ and nCbSh$_C$ are derived as specified below.

75.    The Accused Products perform "adding prediction residual obtained from the bit stream indicating the first image and the predictive image to obtain the first still image." For example, in the HEVC decoding process, arrays of prediction residual samples obtained from the bit stream, at a location where the additional information BitstreamToDecode indicating the first still image was extracted, are added to the predictive image (as array of samples predicted for the first still image) to generate the first still image. The ITU-T H.265 Standard provides support for this:

The decoding process for coding units coded in inter prediction mode consists of the following ordered steps:

1. The inter prediction process as specified in clause 8.5.2 is invoked with the luma location ( xCb, yCb ) and the luma coding block size log2CbSize as inputs, and the outputs are the array predSamples$_L$ and, when ChromaArrayType is not equal to 0, the arrays predSamples$_{Cb}$ and predSamples$_{Cr}$.

2. The decoding process for the residual signal of coding units coded in inter prediction mode specified in clause 8.5.4 is invoked with the luma location ( xCb, yCb ) and the luma coding block size log2CbSize as inputs, and the outputs are the array resSamples$_L$ and, when ChromaArrayType is not equal to 0, the arrays resSamples$_{Cb}$ and resSamples$_{Cr}$.

---

**8.6.7    Picture construction process prior to in-loop filter process**

Inputs to this process are:

- a location ( xCurr, yCurr ) specifying the top-left sample of the current block relative to the top-left sample of the current picture component,

- the variables nCurrSw and nCurrSh specifying the width and height, respectively, of the current block,

- a variable cIdx specifying the colour component of the current block,

- an (nCurrSw)x(nCurrSh) array predSamples specifying the predicted samples of the current block,

- an (nCurrSw)x(nCurrSh) array resSamples specifying the residual samples of the current block.

Depending on the value of the colour component cIdx, the following assignments are made:

- If cIdx is equal to 0, recSamples corresponds to the reconstructed picture sample array S$_L$ and the function clipCidx1 corresponds to Clip1$_Y$.

- Otherwise, if cIdx is equal to 1, recSamples corresponds to the reconstructed chroma sample array S$_{Cb}$ and the function clipCidx1 corresponds to Clip1$_C$.

- Otherwise (cIdx is equal to 2), recSamples corresponds to the reconstructed chroma sample array S$_{Cr}$ and the function clipCidx1 corresponds to Clip1$_C$.

The (nCurrSw)x(nCurrSh) block of the reconstructed sample array recSamples at location ( xCurr, yCurr ) is derived as follows:

$$\text{recSamples}[\, xCurr + i\,][\, yCurr + j\,] = \text{clipCidx1}(\, \text{predSamples}[\, i\,][\, j\,] + \text{resSamples}[\, i\,][\, j\,]\,) \qquad (8\text{-}327)$$
$$\text{with } i = 0..nCurrSw - 1, j = 0..nCurrSh - 1$$

76.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

77.    At a minimum, Acer has known of the '169 patent at least as early as the filing date of the Complaint. In addition, Acer has known about the '169 patent at least as early as April 20, 2021, when it met with SPV to discuss the patents-in-suit. Further, Acer has known about the '169 patent since at least February 4, 2021, when Acer acknowledged access to a data room providing notice of its infringement. Moreover, Acer has been on notice of the '169 patent as a result of previous lawsuits filed by the Plaintiff against competitors of Acer and other relevant market participants, such as TCL and Hisense.

78.     Prior to the filing of the Complaint, Acer knew or should have known of the '169 patent, and knew or should have known that they infringed the '169 patent's claims. Indeed, at a minimum, they exercised willful blindness to the existence of the '169 patent and took deliberately wrongful steps to ignore their infringement of the '169 patent

79.     On information and belief, since at least the above-mentioned date when Acer was on notice of its infringement, Acer has actively induced, under U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the Accused Products that include or are made using all of the limitations of one or more claims of the '169 patent to directly infringe one or more claims of the '169 patent by using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned date, Acer does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '169 patent. Acer intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, testing and certifying features related to H.265 decoding in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. As noted above, this includes, but is not limited to, the collective willful blindness of the Acer Group, including their singular and collective refusal to investigate whether the Accused Products infringe the '169 patent.

80.     On information and belief, despite having knowledge of the '169 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '169 patent, Acer has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Acer's infringing activities relative to the '169 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

81.     SPV has been damaged as a result of Acer's infringing conduct described in this Count. Acer is, thus, liable to SPV in an amount that adequately compensates SPV for Acer's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT IV
### (INFRINGEMENT OF U.S. PATENT NO. 8,737,476)

82.     Plaintiff incorporates paragraphs 1 through 81 herein by reference.

83.     SPV is the assignee of the '476 patent, entitled "Image decoding device, image decoding method, integrated circuit, and program for performing parallel decoding of coded image data," with ownership of all substantial rights in the '476 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

84.     The '476 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '476 patent issued from U.S. Patent Application No. 12/812,134.

85.     Acer has and continues to directly and/or indirectly infringe (by inducing infringement) one or more claims of the '476 patent in this judicial district and elsewhere in Texas and the United States.

86.     On information and belief, Acer designs, develops, manufactures, assembles and markets computers, projectors, and other devices configured to decode H.265/HEVC video. The Accused Products include a processor that supports H.265/HEVC video decoding. For example, the Swift X laptop an Intel H35 series processor. See https://www.acer.com/ac/en/US/content/series/swiftxintel (last visited November 23, 2021) (stating "Engineered for creation and play, the Swift X houses the latest 11th Gen Intel® Core™ H35 series processors."). As an eleventh-generation processor, the H35 series processor in the Swift X laptop includes supports H.265/HEVC video decoding. See https://www.intel.com/content/www/us/en/developer/articles/technical/encode-and-decode-capabilities-for-7th-generation-intel-core-processors-and-newer.html (last visited November 23, 2021).

87.     Acer directly infringes the '476 patent via 35 U.S.C. § 271(a) by making, offering for sale, selling, and/or importing those Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '476 patent to, for example, its alter egos, agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers. Furthermore, on information and belief, Acer sells and makes the Accused Products outside of the United States, delivers those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby

directly infringing the '476 patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, Acer directly infringes the '476 patent through its direct involvement in the activities of its subsidiaries, including Acer America Corporation, including by selling and offering for sale the Accused Products directly to such subsidiaries and importing the Accused Products into the United States for such subsidiaries. Such subsidiaries conduct activities that constitute direct infringement of the '476 patent under 35 U.S.C. § 271(a) by making, offering for sale, selling, and/or importing those Accused Products. For example, and on information and belief, Acer offers for sale, sells, and imports the Accused Products within the U.S. to, for example, its distributors, customers, subsidiaries, importers, and/or consumers. Further, Acer is vicariously liable for this infringing conduct of its U.S.-based sales subsidiaries, e.g., Acer America Corporation, (under both the alter ego and agency theories) because, as an example and on information and belief, Acer and Acer America Corporation are essentially the same company, and Acer has the right and ability to control its subsidiaries infringing acts and receives a direct financial benefit from the infringement of its U.S.-based sales subsidiaries.

88.     For example, Acer infringes claim 14 of the '476 patent via the Accused Products. The Accused Products perform the "image decoding method of decoding coded image data on a block-by-block basis, the coded image data being resulted from coding, on a block-by-block basis, of image data partitioned into blocks each of which has a predetermined number of pixels" of claim 14. For example, the Accused Products include an H.265 decoder that receives a coded image and decodes it on a block-by-block basis. The coded image resulted from coding, on a block-by-block basis, of image data partitioned into blocks, known as CTUs. The CTUs have a predetermined number of pixels (e.g., 64 x 64 pixels).

89.     The Accused Products perform "pre-decoding, on a block-by-block basis, reference information indicating a number of reference images to be referred to on a block-by-block basis for decoding the coded image data." For example, as part of processing H.265 encoded video, the Accused Products use "slice decoding." The slice decoding process includes obtaining reference information that indicates a number of reference images for decoding an image slice prior to decoding (i.e. pre-decoding) the current image to be decoded on a block-by-block basis. The Accused Products receive information from the slice header that include RPS (Reference Picture Set) information. The ITU-T H.265 Standard provides support for this:



Fig. 7.   Coding structure for RPS example.

90.     The RPS information contains reference information indicating number of images to be referred to for decoding an image slice (e.g. in the example above, images I0 and P1 are the reference images used to decode image B2). For example, RPS contains syntax and index structures that refer to one or more reference pictures and how those reference pictures are to be used to decode image slices. Further, the RPS information also contains reference information

34

indicating number of images to be referred to for decoding an image slice (e.g. in the example above, the number of reference images for Picture B2 is two). The slice header containing the status of the DPB (Decoded Picture Buffer) informs the Accused Product's H.265 decoder of the number of reference images to be referred to for decoding an image slice (e.g., image B2 above requires two reference images to be decoded).

91.　　The Accused Products perform "calculating, on a block-by-block basis using the reference information, a predictive data amount of a reference image to be read out on a block-by-block basis from a storage unit for decoding the coded image data, the storage unit storing data of at least one reference image to be referred to for decoding the coded image data." For example, in H.265/HEVC, the DPB (Decoded Picture Buffer) is a storage unit that stores RPS information, including the reference images to be used for decoding an image slice. In the example above, the DPB stores three reference images (I0, P1, B2) that are used in the example's HEVC decoding process. The Accused Products use the RPS reference information to calculate the amount of reference image data required to decode an image slice. More specifically, the H.265 decoder determines the total amount of reference image data (predictive data amount) required to decode an image slice. For example, for 'n' number of reference images the total predictive data amount is 'n' times the data amount of one reference image. In the example above, to decode the B2 image the H.265 decoder calculates that a predictive data amount associated with two reference images (I0 and P1) is to be read out from the DPB since two reference images are used to decode the image B2.

92.　　The Accused Products perform "determining, using the predictive data amount calculated, multiple blocks in the coded image data which are to be decoded in parallel, in such a manner as to reduce variation in amounts of data read out from the storage unit." For example, the

Accused Products use the predictive data (referenced above) and the reference images to determine the blocks (CTUs) that are to be decoded in parallel in the current image to be decoded. For example, as shown above, the H.265 decoder determines the multiple blocks in image B2 to be decoded in parallel using exemplary reference images I0 and P1.

93.     The Accused Products perform "decoding in parallel the determined multiple blocks in the coded image data." For example, the Accused Products decode the determined multiple blocks in parallel. For example, as shown above, multiple blocks in exemplary image B2 are decoded in parallel while the exemplary H.265 decoder uses images I0 and P1 as reference images to decode the same.

94.      The technology discussion above and the exemplary Accused Products provide context for Plaintiff's allegations that each limitation of claim 14 is met.

95.     At a minimum, Acer has known of the '476 patent at least as early as the filing date of the Complaint. In addition, Acer has known about the '476 patent at least as early as April 20, 2021, when it met with SPV to discuss the patents-in-suit. Further, Acer has known about the '476 patent since at least February 4, 2021, when Acer acknowledged access to a data room providing notice of its infringement. Moreover, Acer has been on notice of the '476 patent as a result of previous lawsuits filed by the Plaintiff against competitors of Acer and other relevant market participants, such as TCL and Hisense.

96.     Prior to the filing of the Complaint, Acer knew or should have known of the '476 patent, and knew or should have known that they infringed the '476 patent's claims. Indeed, at a minimum, they exercised willful blindness to the existence of the '476 patent and took deliberately wrongful steps to ignore their infringement of the '476 patent.

97.     On information and belief, since at least the above-mentioned date when Acer was on notice of its infringement, Acer has actively induced, under U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the Accused Products that include or are made using all of the limitations of one or more claims of the '476 patent to directly infringe one or more claims of the '476 patent by using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned date, Acer does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '476 patent. Acer intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, testing and certifying features related to H.265 decoding in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. As noted above, this includes, but is not limited to, the collective willful blindness of the Acer Group, including their singular and collective refusal to investigate whether the Accused Products infringe the '476 patent.

98.     On information and belief, despite having knowledge of the '476 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '476 patent, Acer has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Acer's infringing activities relative to the '476 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant,

characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

99.     SPV has been damaged as a result of Acer's infringing conduct described in this Count. Acer is, thus, liable to SPV in an amount that adequately compensates SPV for Acer's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT V
### (INFRINGEMENT OF U.S. PATENT NO. 8,971,401)

100.    Plaintiff incorporates paragraphs 1 through 99 herein by reference.

101.    SPV is the assignee of the '401 patent, entitled "Image decoding device" with ownership of all substantial rights in the '401 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

102.    The '401 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '401 patent issued from U.S. Patent Application No. 13/246,503.

103.    Acer has and continues to directly and/or indirectly infringe (by inducing infringement) one or more claims of the '401 patent in this judicial district and elsewhere in Texas and the United States.

104.    On information and belief, Acer designs, develops, manufactures, assembles and markets computers, projectors, and other devices configured to decode H.265/HEVC video. The Accused Products include a processor that supports H.265/HEVC video decoding. For example, the Swift X laptop an Intel H35 series processor. See https://www.acer.com/ac/en/US/content/series/swiftxintel (last visited November 23, 2021)

(stating "Engineered for creation and play, the Swift X houses the latest 11th Gen Intel® Core™ H35 series processors."). As an eleventh-generation processor, the H35 series processor in the Swift X laptop includes supports H.265/HEVC video decoding. See https://www.intel.com/content/www/us/en/developer/articles/technical/encode-and-decode-capabilities-for-7th-generation-intel-core-processors-and-newer.html (last visited November 23, 2021).

105.    Acer directly infringes the '401 patent via 35 U.S.C. § 271(a) by making, offering for sale, selling, and/or importing those Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '401 patent to, for example, its alter egos, agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers. Furthermore, on information and belief, Acer sells and makes the Accused Products outside of the United States, delivers those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby directly infringing the '401 patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, Acer directly infringes the '401 patent through its direct involvement in the activities of its subsidiaries, including Acer America Corporation, including by selling and offering for sale the Accused Products directly to such subsidiaries and importing the Accused Products into the United States for such subsidiaries. Such subsidiaries conduct activities that constitute direct infringement of the '401 patent under 35 U.S.C. § 271(a) by making, offering for sale, selling, and/or importing those Accused Products. For example, and on information and belief, Acer offers for sale, sells, and

imports the Accused Products within the U.S. to, for example, its distributors, customers, subsidiaries, importers, and/or consumers. Further, Acer is vicariously liable for this infringing conduct of its U.S.-based sales subsidiaries, e.g., Acer America Corporation, (under both the alter ego and agency theories) because, as an example and on information and belief, Acer and Acer America Corporation are essentially the same company, and Acer has the right and ability to control its subsidiaries infringing acts and receives a direct financial benefit from the infringement of its U.S.-based sales subsidiaries.

106. For example, Acer infringes claim 1 of the '401 patent via the Accused Products. The Accused Products comprise the "image decoding device for processing an input bit stream containing encoded data obtained by encoding a moving picture using intra-frame prediction, where each of the macroblocks of the moving picture includes a plurality of prediction units for the intra-frame prediction" of claim 1. For example, the Accused Products are configured to decode H.265 encoded video that comprises input bitstreams encoded using intra-frame prediction. The CTUs (macroblocks) of the video frames include a plurality of Prediction Units (PUs) for the intra-prediction.

107. The Accused Products comprise "a stream divider configured to divide the input bit stream into a plurality of sub-streams." For example, the Accused Products are configured to use the CABAC parsing process. In the CABAC parsing process, a stream divider is configured to divide the input bitstream into slices (sub-streams) to be decoded. The sub-streams comprise CTU rows for parallel processing, including but not limited to Wavefront Parallel Processing (WPP), which is used by H.265 for entropy decoding.

108. The Accused Products comprise "a plurality of image decoders each configured to decode the corresponding one of the plurality of sub-streams, thereby outputting images." For

example, as part of WPP, the Accused Products are configured to use a plurality of decoders to decode the slices in parallel. The plurality of image decoders may comprise a plurality of physical and/or logical cores/threads/engines/units.

109.   The Accused Products are configured such that "the stream divider divides the encoded data corresponding to one of the macroblocks into groups each made up of at least one of the prediction units and outputs the sub-streams so that the groups are included in different ones of the sub-streams, each of the sub-streams includes prediction units from different macroblocks." For example, the H.265 encoded data corresponding to one of the CTUs (macroblocks) is divided into a plurality of coding units (CU) (groups), each group includes at least one of the prediction units. Individual CTUs including their CU (groups) are included in different WPP slices (sub-streams), with each slice including PUs from different CTUs (macroblocks).

110.   The technology discussion above and the exemplary Accused Products provide context for Plaintiff's allegations that each limitation of claim 1 is met.

111.   At a minimum, Acer has known of the '401 patent at least as early as the filing date of the Complaint. In addition, Acer has known about the '401 patent at least as early as April 20, 2021, when it met with SPV to discuss the patents-in-suit. Further, Acer has known about the '401 patent since at least February 4, 2021, when Acer acknowledged access to a data room providing notice of its infringement. Moreover, Acer has been on notice of the '401 patent as a result of previous lawsuits filed by the Plaintiff against competitors of Acer and other relevant market participants, such as TCL and Hisense.

112.   Prior to the filing of the Complaint, Acer knew or should have known of the '401 patent, and knew or should have known that they infringed the '401 patent's claims. Indeed, at a

minimum, they exercised willful blindness to the existence of the '401 patent and took deliberately wrongful steps to ignore their infringement of the '401 patent.

113. On information and belief, since at least the above-mentioned date when Acer was on notice of its infringement, Acer has actively induced, under U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the Accused Products that include or are made using all of the limitations of one or more claims of the '401 patent to directly infringe one or more claims of the '401 patent by using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned date, Acer does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '401 patent. Acer intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, testing and certifying features related to H.265 decoding in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. As noted above, this includes, but is not limited to, the collective willful blindness of the Acer Group, including their singular and collective refusal to investigate whether the Accused Products infringe the '401 patent.

114. On information and belief, despite having knowledge of the '401 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '401 patent, Acer has nevertheless continued its infringing conduct and disregarded an objectively high

likelihood of infringement. Acer's infringing activities relative to the '401 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

115.    SPV has been damaged as a result of Acer's infringing conduct described in this Count. Acer is, thus, liable to SPV in an amount that adequately compensates SPV for Acer's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT VI
### (INFRINGEMENT OF U.S. PATENT NO. 9,042,457)

116.    Plaintiff incorporates paragraphs 1 through 115 herein by reference.

117.    SPV is the assignee of the '457 patent, entitled "Image Decoding Apparatus and Image Coding Apparatus with Parallel Decoding," with ownership of all substantial rights in the '457 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

118.    The '457 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '457 patent issued from U.S. Patent Application No. 12/673,408.

119.    Acer has and continues to directly and/or indirectly infringe (by inducing infringement) one or more claims of the '457 patent in this judicial district and elsewhere in Texas and the United States.

120.    On information and belief, Acer designs, develops, manufactures, assembles and markets computers, projectors, and other devices configured to decode H.265/HEVC video. The

Accused Products include a processor that supports H.265/HEVC video decoding. For example, the Swift X laptop an Intel H35 series processor. See https://www.acer.com/ac/en/US/content/series/swiftxintel (last visited November 23, 2021) (stating "Engineered for creation and play, the Swift X houses the latest 11th Gen Intel® Core™ H35 series processors."). As an eleventh-generation processor, the H35 series processor in the Swift X laptop includes supports H.265/HEVC video decoding. See https://www.intel.com/content/www/us/en/developer/articles/technical/encode-and-decode-capabilities-for-7th-generation-intel-core-processors-and-newer.html (last visited November 23, 2021).

121. Acer directly infringes the '457 patent via 35 U.S.C. § 271(a) by making, offering for sale, selling, and/or importing those Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '457 patent to, for example, its alter egos, agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers. Furthermore, on information and belief, Acer sells and makes the Accused Products outside of the United States, delivers those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby directly infringing the '457 patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, Acer directly infringes the '457 patent through its direct involvement in the activities of its subsidiaries, including Acer America Corporation, including by selling and offering for sale the Accused Products directly to such subsidiaries and importing the Accused Products into the United States

for such subsidiaries. Such subsidiaries conduct activities that constitute direct infringement of the '457 patent under 35 U.S.C. § 271(a) by making, offering for sale, selling, and/or importing those Accused Products. For example, and on information and belief, Acer offers for sale, sells, and imports the Accused Products within the U.S. to, for example, its distributors, customers, subsidiaries, importers, and/or consumers. Further, Acer is vicariously liable for this infringing conduct of its U.S.-based sales subsidiaries, e.g., Acer America Corporation, (under both the alter ego and agency theories) because, as an example and on information and belief, Acer and Acer America Corporation are essentially the same company, and Acer has the right and ability to control its subsidiaries infringing acts and receives a direct financial benefit from the infringement of its U.S.-based sales subsidiaries.

122.    For example, Acer infringes claim 7 of the '457 patent via the Accused Products. The Accused Products perform the "image decoding method for decoding, using a processor, a coded stream generated by coding, on a block-by-block basis, a picture including blocks" of claim 7. For example, the Accused Products include a video decoder that is configured to decode H.265 encoded data. Each of the Accused Products includes a processor for executing instructions to operate the full functionality of the product, including H.265 decoding functionality. The Accused Products use a processor to decode a coded stream that resulted from coding, on a block-by-block basis, a picture including blocks, known as CTUs.

123.    The Accused Products use the processor for "performing, on a block group-by-block group basis, variable length decoding, and generating block decoding information using a result of the variable length decoding for each of a plurality of block groups which (i) contain blocks, (ii) are different from each other, and (iii) are included in the coded stream, the block decoding information for the block group being a parameter necessary for decoding another block

group from among the plurality of block groups." For example, the processor performs, on a block group-by-block group basis, variable length decoding, and generates block decoding information using a result of the variable length decoding of plurality of block groups. The source code within the Accused Products is believed to incorporate variable length decoding on a block group-by-block group basis in conformance with H.265 (e.g., predecoding the slice header provides syntax elements for subsequent decoding operations).



https://www.researchgate.net/publication/290180658_Entropy_Coding_in_HEVC

124. The processor determines the locations, within the network abstraction layer (NAL) unit, of encoded syntax elements. The encoded syntax elements point to the start point of the substreams in the bitstream, with the locations of the start points obtained as a result of the variable length decoding of the syntax elements. Thus, the block decoding information (e.g., encoded syntax elements) are generated using the result of the variable length decoding for each block group. The plurality of block groups contain blocks. Each block group (substream) contains a

unique set of blocks. This is shown, for example, in the annotated image below by an encoded

bitstream comprising four substreams (block groups) each comprised of a different group of CTUs.



https://www.researchgate.net/publication/290180658_Entropy_Coding_in_HEVC

125.    The plurality of block groups are included in the coded stream. For example, the

substreams are included in the slice segment data. The block decoding information for the block

group is a parameter necessary for decoding another block group from among the plurality of block

groups. For example, the block decoding information (e.g., encoded syntax elements) is necessary

for decoding another substream: there is a contextual dependency between substreams.

126.    The Accused Products use the processor for "decoding, on a block-by-block basis

using the block decoding information generated using the result of the variable length decoding

performed in said performing, each of the plurality of block groups in parallel, wherein said

decoding performed on the block-by-block basis on each of the plurality of block groups in parallel

includes re-executing the variable length decoding on each of the plurality of block groups on

which the variable length decoding has been performed in said performing to determine a

prediction mode to be performed on the block group." For example, H.265 is designed for

platforms configured to perform parallel decoding of a plurality of individual substreams (block

groups). The source code within the Accused Products is believed to incorporate decoding in

parallel in conformance with H.265. The Accused Products support parallel processing, such as

Wavefront Parallel Processing, to conform with H.265. The blocks in one of the block groups

(substreams) are decoded by using the block decoding information (syntax elements). The syntax

elements signal the start of each substream. Substreams are decoded in parallel on a block-by-

47

block basis. The decoding performed on the block-by-block basis on each of the plurality of block groups in parallel includes re-executing the variable length decoding on each of the plurality of blocks groups on which the variable length decoding has been performed in said performing to determine a prediction mode to be performed on the block group. For example, the entropy decoder re-executes variable length decoding on the blocks in the block groups using the syntax data obtained in the predecoding process. The prediction mode is dependent on the syntax elements of the current block in view of the previously decoded blocks' syntax elements. H.265 specifies that information allowing for a determination of a prediction mode to be performed on a block group is contained in the coded bitstream. The ITU-T H.265 Standard provides support for this:

Table 7-10 – Name association to prediction mode and partitioning type

| CuPredMode[ x0 ][ y0 ] | part_mode | IntraSplitFlag | PartMode |
|---|---|---|---|
| MODE_INTRA | 0 | 0 | PART_2Nx2N |
| | 1 | 1 | PART_NxN |
| MODE_INTER | 0 | 0 | PART_2Nx2N |
| | 1 | 0 | PART_2NxN |
| | 2 | 0 | PART_Nx2N |
| | 3 | 0 | PART_NxN |
| | 4 | 0 | PART_2NxnU |
| | 5 | 0 | PART_2NxnD |
| | 6 | 0 | PART_nLx2N |
| | 7 | 0 | PART_nRx2N |

https://www.itu.int/rec/T-REC-H.265/en p. 101

Table 8-1 – Specification of intra prediction mode and associated names

| Intra prediction mode | Associated name |
|---|---|
| 0 | INTRA_PLANAR |
| 1 | INTRA_DC |
| 2..34 | INTRA_ANGULAR2..INTRA_ANGULAR34 |

https://www.itu.int/rec/T-REC-H.265/en p. 118

127.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's allegations that each limitation of claim 7 is met.

128.    At a minimum, Acer has known of the '457 patent at least as early as the filing date of the Complaint. In addition, Acer has known about the '457 patent at least as early as April 20, 2021, when it met with SPV to discuss the patents-in-suit. Further, Acer has known about the '457 patent since at least February 4, 2021, when Acer acknowledged access to a data room providing notice of its infringement. Moreover, Acer has been on notice of the '457 patent as a result of

previous lawsuits filed by the Plaintiff against competitors of Acer and other relevant market participants, such as LG, TCL, and Hisense.

129.    Prior to the filing of the Complaint, Acer knew or should have known of the '457 patent, and knew or should have known that they infringed the '457 patent's claims. Indeed, at a minimum, they exercised willful blindness to the existence of the '457 patent and took deliberately wrongful steps to ignore their infringement of the '457 patent

130.    On information and belief, since at least the above-mentioned date when Acer was on notice of its infringement, Acer has actively induced, under U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the Accused Products that include or are made using all of the limitations of one or more claims of the '457 patent to directly infringe one or more claims of the '457 patent by using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned date, Acer does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '457 patent. Acer intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, testing and certifying features related to H.265 decoding in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. As noted above, this includes, but is not limited

to, the collective willful blindness of the Acer Group, including their singular and collective refusal to investigate whether the Accused Products infringe the '457 patent.

131.    On information and belief, despite having knowledge of the '457 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '457 patent, Acer has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Acer's infringing activities relative to the '457 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

132.    SPV has been damaged as a result of Acer's infringing conduct described in this Count. Acer is, thus, liable to SPV in an amount that adequately compensates SPV for Acer's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT VII
### (INFRINGEMENT OF U.S. PATENT NO. 9,414,059)

133.    Plaintiff incorporates paragraphs 1 through 132 herein by reference.

134.    SPV is the assignee of the '059 patent, entitled "Image Processing Device, Image Coding Method, and Image Processing Method" with ownership of all substantial rights in the '059 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

135.    The '059 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '059 patent issued from U.S. Patent Application No. 13/877,389.

136.    Acer has and continues to directly and/or indirectly infringe (by inducing infringement) one or more claims of the '059 patent in this judicial district and elsewhere in Texas and the United States.

137.    On information and belief, Acer designs, develops, manufactures, assembles and markets computers, projectors, and other devices configured to decode H.265/HEVC video. The Accused Products include a processor that supports H.265/HEVC video decoding. For example, the Swift X laptop an Intel H35 series processor. See https://www.acer.com/ac/en/US/content/series/swiftxintel (last visited November 23, 2021) (stating "Engineered for creation and play, the Swift X houses the latest 11th Gen Intel® Core™ H35 series processors."). As an eleventh-generation processor, the H35 series processor in the Swift X laptop includes supports H.265/HEVC video decoding. See https://www.intel.com/content/www/us/en/developer/articles/technical/encode-and-decode-capabilities-for-7th-generation-intel-core-processors-and-newer.html (last visited November 23, 2021).

138.    Acer directly infringes the '059 patent via 35 U.S.C. § 271(a) by making, offering for sale, selling, and/or importing those Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '059 patent to, for example, its alter egos, agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers. Furthermore, on information and belief, Acer sells and makes the Accused Products outside of the United States, delivers those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby

directly infringing the '059 patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, Acer directly infringes the '059 patent through its direct involvement in the activities of its subsidiaries, including Acer America Corporation, including by selling and offering for sale the Accused Products directly to such subsidiaries and importing the Accused Products into the United States for such subsidiaries. Such subsidiaries conduct activities that constitute direct infringement of the '059 patent under 35 U.S.C. § 271(a) by making, offering for sale, selling, and/or importing those Accused Products. For example, and on information and belief, Acer offers for sale, sells, and imports the Accused Products within the U.S. to, for example, its distributors, customers, subsidiaries, importers, and/or consumers. Further, Acer is vicariously liable for this infringing conduct of its U.S.-based sales subsidiaries, e.g., Acer America Corporation, (under both the alter ego and agency theories) because, as an example and on information and belief, Acer and Acer America Corporation are essentially the same company, and Acer has the right and ability to control its subsidiaries infringing acts and receives a direct financial benefit from the infringement of its U.S.-based sales subsidiaries.

139.     For example, Acer infringes claim 1 of the '059 patent via the Accused Products. The Accused Products comprise an "image processing device which performs plural first processes, by pipelining, on a coded stream obtained by dividing an image into plural coding unit blocks according to at least two numbers of pixels and coding the image on a coding unit block-by-block basis" of claim 1. For example, each of the Accused Products supports the H.265/HEVC standard. The Accused Products process H.265/HEVC encoded video via a pipelined process. A block comprises an array of samples (individual pixel data) that is used to code an image. The coding is performed on a block-by-block basis because an image will be partitioned into multiple

blocks to be coded. The blocks can be of various sizes, therefore containing at least two numbers of pixels (e.g., 8x8, 16x16, etc.).

140.    The Accused Products comprise "plural first process units configured to perform, by the pipelining, the plural first processes on the coded stream by each executing one of the plural first processes." For example, the Accused Products comprise multiple first process units configured to decode the sub-streams of the coded stream in parallel. The cores of the processor on the Accused Products can comprise separate first process units. The source code within the Accused Products is believed to incorporate one or more parallel processing tools supported by the H.265/HEVC standard. Such tools include, but are not necessarily limited to, tiles, wavefront parallel processing, and entropy slices. In a wavefront parallel processing example, CTUs in different slices are decoded in parallel. The processing units handling the respective threads via pipelining comprise the plural first process units.

141.    The Accused Products comprise "a control unit configured to divide or connect portions of the coded stream into plural first processing unit blocks according to a first number of pixels, each of the first processing unit blocks having the same number of pixels in the image, and control the plural first process units to cause the plural first processes to be executed for each of the first processing unit blocks." For example, the control path for the CABAC decoder in the Accused Products serves as the control unit. The source code within the Accused Products that operates the HEVC functionality, including dividing portions of the coded stream into slices that are further partitioned into CTUs of the same size serves as the control unit. The plural first processes are executed for each of the CTUs. The syntax data of the bitstream uses entry points to indicate how to construct the substreams for parallel processing.

142.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's allegations that each limitation of claim1 is met.

143.    At a minimum, Acer has known of the '059 patent at least as early as the filing date of the Complaint. In addition, Acer has known about the '059 patent at least as early as April 20, 2021, when it met with SPV to discuss the patents-in-suit. Further, Acer has known about the '059 patent since at least February 4, 2021, when Acer acknowledged access to a data room providing notice of its infringement.

144.    Prior to the filing of the Complaint, Acer knew or should have known of the '059 patent, and knew or should have known that they infringed the '059 patent's claims. Indeed, at a minimum, they exercised willful blindness to the existence of the '059 patent and took deliberately wrongful steps to ignore their infringement of the '059 patent. Moreover, Acer has been on notice of the '059 patent as a result of previous lawsuits filed by the Plaintiff against competitors of Acer and other relevant market participants, such as LG, TCL, and Hisense.

145.    On information and belief, since at least the above-mentioned date when Acer was on notice of its infringement, Acer has actively induced, under U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the Accused Products that include or are made using all of the limitations of one or more claims of the '059 patent to directly infringe one or more claims of the '059 patent by using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned date, Acer does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '059 patent. Acer intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, *inter alia*, creating advertisements that promote the infringing use of the Accused Products,

creating and/or maintaining established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, testing and certifying features related to H.265 decoding in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. As noted above, this includes, but is not limited to, the collective willful blindness of the Acer Group, including their singular and collective refusal to investigate whether the Accused Products infringe the '059 patent.

146. On information and belief, despite having knowledge of the '059 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '059 patent, Acer has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Acer's infringing activities relative to the '059 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

147. SPV has been damaged as a result of Acer's infringing conduct described in this Count. Acer is, thus, liable to SPV in an amount that adequately compensates SPV for Acer's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT VIII
### (INFRINGEMENT OF U.S. PATENT NO. 9,667,972)

148. Plaintiff incorporates paragraphs 1 through 147 herein by reference.

149.     SPV is the assignee of the '972 patent, entitled "Image coding device, image coding method, and image coding integrated circuit" with ownership of all substantial rights in the '972 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

150.     The '972 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '972 patent issued from U.S. Patent Application No. 14/555,825.

151.     Acer has and continues to directly and/or indirectly infringe (by inducing infringement) one or more claims of the '972 patent in this judicial district and elsewhere in Texas and the United States.

152.     On information and belief, Acer designs, develops, manufactures, assembles and markets computers, projectors, and other devices configured to decode H.265/HEVC video. The Accused Products include a processor that supports H.265/HEVC video decoding. For example, the Swift X laptop an Intel H35 series processor. See https://www.acer.com/ac/en/US/content/series/swiftxintel (last visited November 23, 2021) (stating "Engineered for creation and play, the Swift X houses the latest 11th Gen Intel® Core™ H35 series processors."). As an eleventh-generation processor, the H35 series processor in the Swift X laptop includes supports H.265/HEVC video decoding. See https://www.intel.com/content/www/us/en/developer/articles/technical/encode-and-decode-capabilities-for-7th-generation-intel-core-processors-and-newer.html (last visited November 23, 2021).

153.     Acer directly infringes the '972 patent via 35 U.S.C. § 271(a) by making, offering for sale, selling, and/or importing those Accused Products, their components and processes, and/or

products containing the same that incorporate the fundamental technologies covered by the '972 patent to, for example, its alter egos, agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers. Furthermore, on information and belief, Acer sells and makes the Accused Products outside of the United States, delivers those products to its customers, distributors, and/or subsidiaries in the United States, or in the case that it delivers the Accused Products outside of the United States it does so intending and/or knowing that those products are destined for the United States and/or designing those products for sale in the United States, thereby directly infringing the '972 patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013). Furthermore, Acer directly infringes the '972 patent through its direct involvement in the activities of its subsidiaries, including Acer America Corporation, including by selling and offering for sale the Accused Products directly to such subsidiaries and importing the Accused Products into the United States for such subsidiaries. Such subsidiaries conduct activities that constitute direct infringement of the '972 patent under 35 U.S.C. § 271(a) by making, offering for sale, selling, and/or importing those Accused Products. For example, and on information and belief, Acer offers for sale, sells, and imports the Accused Products within the U.S. to, for example, its distributors, customers, subsidiaries, importers, and/or consumers. Further, Acer is vicariously liable for this infringing conduct of its U.S.-based sales subsidiaries, e.g., Acer America Corporation, (under both the alter ego and agency theories) because, as an example and on information and belief, Acer and Acer America Corporation are essentially the same company, and Acer has the right and ability to control its subsidiaries infringing acts and receives a direct financial benefit from the infringement of its U.S.-based sales subsidiaries.

154. For example, Acer infringes claim 5 of the '972 patent via the Accused Products. The Accused Products implement an "image encoding method that causes a programmed computer to compression-encode an image in units of blocks having a predetermined size" of claim 5. For example, the Accused Products are configured to implement image encoding software that compresses and encodes images on a block-by-block basis. The encoding utilizes coding-tree units (CTUs) having a predetermined number of pixels (e.g., 64 x 64).

155. The Accused Products implement "the image encoding method having a first encoding mode in which a motion vector of an encoding-target block is not encoded and the motion vector of the encoding-target block is calculated based on motion vectors of a plurality of adjacent blocks that are adjacent to the encoding-target block." For example, H.265 encoding allows for a target block to be encoded ("encoding-target block") using motion vector information of adjacent blocks to the target block. The encoding-target block is a first encoding mode. Prior to encoding a motion vector of a target block the H.265 encoder calculates motion vector information of the target block with respect to a neighboring blocks adjacent to the target block to be encoded. The H.265 encoder requires spatial and temporal motion vector predictor information before encoding the target block in a first encoding mode.

156. In the image encoding method performed by the Accused Products "each of adjacent blocks being an immediate neighbor of the encoding-target block, and each of adjacent blocks preceding the encoding-target block in coding order." For example, the adjacent blocks are immediate neighbors of the target block to be encoded by the H.265 encoder. Further, H.265 performs a raster scan where each block is coded independently by following a scan order. The left and top neighbor blocks to the target block are encoded prior to encoding the target block, while the right and bottom neighbor blocks are encoded after the target block.

157.    The image encoding method performed by the Accused Products includes "speculatively calculating, when the adjacent blocks include an adjacent block whose encoding mode has not yet been determined and in case the encoding-target block is to be encoded in the first encoding mode." For example, the H.265 encoder creates an MPM (Most Probable Mode) array based on the modes of the neighboring blocks comprised of possible encoding modes to encode the target block. When the encoding mode of the blocks adjacent to the target block (in the below example neighboring blocks C and E) are not determined, the H.265 encoder assumes a most probable mode to encode the target block ("speculatively calculating") in case the target block is to be encoded in ("in the first encoding mode") the encoding modes of encoded neighbor blocks (in the below example neighboring blocks B and D).

158.    The image encoding method performed by the Accused Products includes "one or more motion vector candidates for encoding the encoding-target block in the first encoding mode, each of the one or more motion vector candidates corresponding to one of some or all of possible encoding modes for encoding the adjacent block." For example, the H.265 encoder considers all possible encoding modes comprising motion vector candidates to encode the target block. The spatial and temporal motion vector information used to encode the target block corresponds to the spatial and temporal motion vector information of possible encoding modes for encoding the adjacent blocks.

159.    The image encoding method performed by the Accused Products includes "determining, when the encoding mode for the adjacent block is determined from among the some or all of possible encoding modes, one of the one or more motion vector candidates that corresponds to the encoding mode for the adjacent block as a first motion vector for encoding the encoding target block in the first encoding mode." For example, the H.265 encoder determines one

or more motion vector candidates corresponding to the encoding mode to be used to encode the target encoding block—this encoding mode ("the first encoding mode") is obtained based on the motion vector information ("a first motion vector") of the adjacent blocks (in the below example blocks B and D) and the H.265 encoder encodes the target block in that encoding mode ("first encoding mode").

160.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's allegations that each limitation of claim 5 is met.

161.    At a minimum, Acer has known of the '972 patent at least as early as the filing date of the Complaint. In addition, Acer has known about the '972 patent at least as early as April 20, 2021, when it met with SPV to discuss the patents-in-suit. Further, Acer has known about the '972 patent since at least February 4, 2021, when Acer acknowledged access to a data room providing notice of its infringement.

162.    Prior to the filing of the Complaint, Acer knew or should have known of the '972 patent, and knew or should have known that they infringed the '972 patent's claims. Indeed, at a minimum, they exercised willful blindness to the existence of the '972 patent and took deliberately wrongful steps to ignore their infringement of the '972 patent.

163.    On information and belief, since at least the above-mentioned date when Acer was on notice of its infringement, Acer has actively induced, under U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, purchase, or sell the Accused Products that include or are made using all of the limitations of one or more claims of the '972 patent to directly infringe one or more claims of the '972 patent by using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned date, Acer does so with knowledge, or with willful blindness of the fact, that the induced acts

constitute infringement of the '972 patent. Acer intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, testing and certifying features related to H.265 decoding in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. As noted above, this includes, but is not limited to, the collective willful blindness of the Acer Group, including their singular and collective refusal to investigate whether the Accused Products infringe the '972 patent.

164.    On information and belief, despite having knowledge of the '972 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '972 patent, Acer has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Acer's infringing activities relative to the '972 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

165.    SPV has been damaged as a result of Acer's infringing conduct described in this Count. Acer is, thus, liable to SPV in an amount that adequately compensates SPV for Acer's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## CONCLUSION

166.    Plaintiff SPV is entitled to recover from Acer the damages sustained by Plaintiff as a result of Acer's wrongful acts, and willful infringement (including its willful blindness of infringement), in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court.

167.    Plaintiff has incurred and will incur attorneys' fees, costs, and expenses in the prosecution of this action. The circumstances of this dispute may give rise to an exceptional case within the meaning of 35 U.S.C. § 285, and Plaintiff is entitled to recover its reasonable and necessary attorneys' fees, costs, and expenses.

## JURY DEMAND

168.    Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

169.    Plaintiff respectfully requests that the Court find in its favor and against Acer, and that the Court grant Plaintiff the following relief:

1.  A judgment that Acer has infringed the Asserted Patents as alleged herein, directly and/or indirectly by way of inducing infringement of such patents;

2.  A judgment for an accounting of all damages sustained by Plaintiff as a result of the acts of infringement by Acer;

3.  A judgment and order requiring Acer to pay Plaintiff damages under 35 U.S.C. § 284, including up to treble damages as provided by 35 U.S.C. § 284, and any royalties determined to be appropriate;

4. A judgment and order requiring Acer to pay Plaintiff pre-judgment and post-judgment interest on the damages awarded;

5. A judgment and order finding this to be an exceptional case and requiring Acer to pay the costs of this action (including all disbursements) and attorneys' fees as provided by 35 U.S.C. § 285; and

6. Such other and further relief as the Court deems just and equitable.

Dated: December 29, 2021                          Respectfully submitted,


                                                  /s/ *Patrick J. Conroy*
                                                  Patrick J. Conroy
                                                  Texas Bar No. 24012448
                                                  Justin Kimble
                                                  Texas Bar No. 24036909
                                                  T. William Kennedy Jr.
                                                  Texas Bar No. 24055771
                                                  Jon Rastegar
                                                  Texas Bar No. 24064043
                                                  Ryan Griffin
                                                  Texas Bar No. 24053687
                                                  **Nelson Bumgardner Conroy PC**
                                                  2727 North Harwood Street
                                                  Suite 250
                                                  Dallas, TX 75201
                                                  Tel: (214) 446-4954
                                                  pat@nelbum.com
                                                  justin@nelbum.com
                                                  bill@nelbum.com
                                                  jon@nelbum.com
                                                  ryan@nelbum.com

                                                  **Attorneys for Plaintiff**
                                                  **Sovereign Peak Ventures, LLC**